## NEW YORK LIFE INS. CO. v. EDWARDS, Collector of Internal Revenue.

## EDWARDS, Collector of Internal Revenue, v. NEW YORK LIFE INS. CO.

(Circuit Court of Appeals, Second Circuit. July 30, 1925.)

### No. 330.

**I. Internal revenue ⬠7—Mutual Insurance company held not entitled to exclude from income overpayments of premiums awaiting apportionment to deferred dividend policies; "credited."**

Overpayments of premiums during taxable year on deferred dividend policies, set apart in special fund to await apportionment among policy holders surviving at distribution period, was not "credited" to individual policy holders, within Revenue Act 1913, § 2 G (a) (b), and cannot be excluded from mutual insurance company's income for year; "credited" meaning finally and irrevocably credited.

**2. Internal revenue ⬤⟹7—Amortization of securities purchased at premium held not deductible as "depreciation by use, wear, and tear" nor as "loss actually sustained."**

Amortization of securities purchased by insurance company at premium was not deductible from income as "depreciation by use, wear, and tear," nor as "loss actually sustained" during year, under Revenue Act 1913, § 2 G (a) (b).

Hough, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Action by the New York Life Insurance Company against William H. Edwards, as Collector of Internal Revenue for the Second District of the State of New York. Judgment for plaintiff, giving insufficient relief (3 F.[2d] 280), and both parties bring error. Reversed and remanded.

The New York Life Insurance Company, a corporation organized and existing under the laws of the state of New York, and having its principal office and place of business in the city of New York and in the Southern district of New York, brought this action to recover $90,556.19, representing a portion of an additional income tax assessed against it for the year 1913 under the provisions of the Revenue Act of October 3, 1913 (38 Stat. 114), and paid by it to the defendant collector under protest.

The action was tried before the District Court and a jury of one, and resulted in a dismissal of the complaint as to the principal item in dispute and in the direction of a verdict in favor of the plaintiff as to the remaining items in dispute, aggregating the sum of $10,927.57.

Both plaintiff and defendant have filed assignments of error, and each has sued out a writ of error.

The facts are stated in the opinion.

The parties are hereinafter referred to as they stood in the court below—the New York Life Insurance Company as plaintiff, and William H. Edwards, the Collector of Internal Revenue, as the defendant.

James H. McIntosh, of New York City, for plaintiff.

Emory R. Buckner, U. S. Atty., of New York City (Thomas J. Crawford, Asst. U. S. Atty., of New York City, E. H. Horton, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C., of counsel), for defendant.

Before ROGERS, HOUGH, and HAND, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The plaintiff is a life insurance company which is conducted on the mutual level premium plan, and it sued to recover $90,556.19, with interest thereon from August 5, 1918, that being the date on which it paid to defendant, under protest, the amount above stated and which had been assessed against it by the collector of internal revenue, as an additional income tax for the year 1913, and which it is claimed was illegally assessed against it and wrongfully collected from it.

The case was heard in the court below on an agreed statement of facts. It discloses that the plaintiff is a mutual company transacting the business of life insurance, and that its policies are issued on the purely mutual, level premium plan, and that it has no shares of capital stock nor stockholders.

The level premium plan is one under which the maximum annual contribution which any member can be asked to pay is uniform throughout the life of the policy. The person insured pays during his early years a sum in excess of the current cost of his insurance. The excess is devoted to the creation of a reserve fund, which enables the insurance to be maintained in the later years, when the stipulated level premium would be insufficient to meet the current cost of insurance on the mutual premium plan. Under the level premium plan, the person insured is understood to receive his insurance at cost; the company collecting its estimated premiums in advance and adjusting the actual cost afterwards.

It appears from the agreed statement of facts that the table rate of premium provided for in life insurance on the mutual, level premium plan is calculated: First, by adopting an accepted table of mortality showing the death rate for each age of life; and, second, by adopting an assumed rate of interest such as the company may safely expect to realize upon its invested assets for the duration of all its policies. With these two factors it is calculated just what sum each insured must pay yearly in advance so as to put the company in funds with which to pay all outstanding policies as they become claims, provided deaths occur exactly in accordance with the table of mortality, and also provided the rate of interest earned on the company's invested funds is exactly the same as the rate assumed in calculating its premiums. The sum ascertained in this way is called the net or mathematical premium. But the net or mathematical premium is not the full amount each

member must pay into a going concern, because it contains no provision for expense of management and unforeseen contingencies, such as excess mortality, diminished interest, investment losses, increased taxation, and the like. Therefore, to provide for these, there is added to the net or mathematical premium a sum technically called "loading." The net or mathematical premium plus the loading constitutes the company's table rate of premium or level premium, and is the estimated sum named in the policy as premium to be paid in advance and adjusted to cost when cost is known, and is the maximum sum which the company can ever require the insured to pay.

The tax complained of was assessed under the Act of Congress approved October 3, 1913. Section 2 of that act provided, among other things, for a tax upon income, and the question herein involved arises under that section, subdivision G (a) and (b), 38 Stat. c. 16, pp. 114, 172, 173. The pertinent portions of the act are as follows:

"That the normal tax hereinbefore imposed upon individuals likewise shall be levied, assessed, and paid annually upon the entire net income arising or accruing from all sources during the preceding calendar year to * * * every insurance company, organized in the United States, no matter how created or organized, not including partnerships. * * *

"Such net income shall be ascertained by deducting from the gross amount of the income of such * * * insurance company, received within the year from all sources, (first) all the ordinary and necessary expenses paid within the year in the maintenance and operation of its business and properties, including rentals or other payments required to be made as a condition to the continued use or possession of property; (second) all losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation by use, wear and tear of property, if any; * * * and in case of insurance companies the net addition, if any, required by law to be made within the year to reserve funds and the sums other than dividends paid within the year on policy and annuity contracts. * * *

"Provided further, * * * that life insurance companies shall not include as income in any year such portion of any actual premium received from any individual policy holder as shall have been paid back or credited to such individual policy holder, or treated as an abatement of premium of such individual policy holder, within such year."

The plaintiff on February 26, 1914, filed what it alleges was "a full, complete, and true return, under oath of its president and treasurer, of its net income received during the calendar year ending December 31, 1913." It stated that the net income of the corporation arising or accruing from all sources during the calendar year ending December 31, 1913, was the sum of $10,057,875.40 and no more.

In due time the Commissioner of Internal Revenue assessed an income tax against the corporation in the sum of $100,578.57 upon its net income as so reported.

Thereafter, and in the year 1918, the Commissioner audited the corporation's accounts for the year 1913, and amended its returns, making its net income appear to be the sum of $9,773,992.71 in excess of the net income as shown by its own return. And the Commissioner accordingly assessed against it an additional tax for the year 1913 of $97,739.93, that being 1 per cent. of $9,773,-992.71. Notice of this additional assessment was served on the plaintiff, and payment on or before August 5, 1918, was demanded. At the same time plaintiff was informed that, unless the sum demanded was paid on or before the date named, there would be imposed a 5 per cent. penalty with 1 per cent. interest per month from July 24, 1918, until paid. In order to avoid the penalties, and on August 5, 1918, the plaintiff paid the amount demanded, $97,739.93. This payment was made under protest, and at the same time plaintiff demanded a refund and repayment of the amount so paid except as to the sum of $7,183.74. It gave notice that, unless defendant complied with its demand, it would resort to every recourse provided by law for the recovery of the sum so paid, claiming that it was erroneously, illegally, unjustly, wrongfully, and excessively assessed and collected.

Thereafter plaintiff appealed to the Commissioner of Internal Revenue, and filed in the Treasury Department its claim for a refund of the tax, and on June 26, 1919, and on May 17, 1920, it filed amendments of its claim. The Commissioner on April 15, 1921, decided the claim against plaintiff, and refused to refund any part of the tax.

Immediately thereafter this suit was commenced. The case was heard by the District Judge upon an agreed statement of facts and with a jury of one. An opinion was filed on December 15, 1924, and judgment was entered on the next day in favor of the plaintiff

in the sum of $7,880.47, with $3,007.71 interest and $26.10 costs. From this judgment both sides have sued out writs of error.

It appears that the court instructed the jury to return a verdict for defendant on the plaintiff's claim for $81,899.18. The plaintiff, in making its return of income for the year 1913 had not included therein the sum of $8,189,918, which it claimed it was entitled to deduct under the provision of the act which declared that "life insurance companies shall not include as income in any year such portion of any actual premium received from any individual policy holder as shall have been paid back or credited to such individual policy holder, or treated as an abatement of premium of such individual policy holder, within such year." The Commissioner of Internal Revenue believing that the plaintiff was in error in not including in its return this sum of $8,189,918 had, as we have seen, reassessed the plaintiff, and in doing so included this sum of $8,189,918 in the amount of the income which the plaintiff received. The court below has sustained the right of the Commissioner to do what he did in that respect.

This sum of $8,189,918 was ascertained to be the aggregate amount of actual premiums received from individual policy holders, and which had been apportioned among and paid back to policy holders during the taxing year. In other words, the sum of $8,189,918 represented the total amount of the overpayment of premiums made by its deferred policy holders in the year 1912.

The contention of the government in this case is very clearly set forth in a letter dated June 20, 1918, and addressed to the plaintiff by the Commissioner of Internal Revenue, and which is set forth in full in the agreed statement of facts. We quote from it the following:

"From the facts presented, it is shown that your company has many semitontine or deferred policies, under which policies the insured or his beneficiary is entitled to receive a dividend at the end of a stated period, provided the policy is in force at that time. If the policy holder dies before the date of the dividend distribution, the beneficiary is entitled to receive only the face value of the policy. The dividend which may be apportioned to the policy is not paid to the beneficiary. It has been observed that it is the practice of your company and similar life insurance companies having deferred dividend policies outstanding, to apportion each year to the deferred dividend policy holders, as a class, certain parts of their surplus. This surplus is not reserved for the payment of dividends and under certain circumstances may be used for other purposes.

"The provisions of the taxing acts, allowing the exclusion from gross income of a life insurance company of portions of premiums, which are paid back or credited to individual policy holders, are in the nature of an exemption from tax and should be strictly construed. A credit of an individual policy holder must be an absolute credit to such a policy holder. A provisional credit to a class of policy holders is not an absolute credit to an individual policy holder, and is therefore not a credit contemplated by the taxing acts.

"Consequently, this office is constrained to hold under the law that only such portions of the premiums actually received from the policy holders as are paid to or actually credited to the accounts of individual policy holders within the taxable year may be excluded from the gross income of a life insurance company.

"To conform to this ruling, it is held that, of the total amount of cash dividends of $9,292,939.49 for the year 1913, the portion that may be excluded from gross income is $372,717.00.

"In accordance with the foregoing, the final adjustment of your return of annual net income will be as follows:

Additional income per office letter of March 28, 1917........$10,146,709.71
Portion of cash dividends now allowed ...................    372,717.00

Additional income as revised $9,773,992.71
Additional tax of 1%..........$97,739.93"

[1] It thus appears that the real question which is presented is whether, in estimating the net income of the plaintiff, the government was entitled to include the aggregate amount of the ascertained, credited, and accumulated overpayments of premiums which were actually apportioned among and paid to its policy holders within the taxing year, and which it claims amounted to $9,292,932.49.

In answering that question it is necessary to have in mind the language of the act of 1913, heretofore quoted, which declares that "life insurance companies shall not include as income in any year such portion of any actual premium received from any individual policy holder as shall have been paid back or credited to such individual policy holder, or treated as an abatement of premium of such individual policy holder, within such year."

Did the plaintiff within the year credit to the individual policy holders the sum of $9,773,992.71 within the meaning of the act? The decision of this case depends upon the answer to that question. The court below evidently thought that the answer to be given is clearly indicated in the decision of the Supreme Court in Penn Mutual Life Insurance Co. v. Lederer, 252 U. S. 523, 40 S. Ct. 397, 64 L. Ed. 698. In that case the court had before it the act of 1913, and the right of a mutual life insurance company in computing gross income to deduct from premium receipts money derived by a mutual company from redundancy of premiums paid in previous years and paid to policy holders during the tax year as dividends in cash and not applied in abatement or reduction of their current premiums. The conclusion reached was that such deduction could not be made. The government in that case contended that in ascertaining the gross income of a life insurance company there should be taken the aggregate of the year's net premium receipts made up separately for each policy holder. The insurance company contended for the rule that in figuring the gross income there should be taken the aggregate full premiums received by the company less the aggregate of all dividends paid by it to any policy holder by credit upon a premium or by abatement of a premium and also of all dividends whatsoever paid to any policy holder in cash, whether applied in payment of a premium or not. The act itself expressly provides, in a noninclusion clause, that a life insurance company shall not include in its gross income in any year such portion of any actual premium received from any individual policy holder "as shall have been paid back or credited to such individual policy holder, or treated as an abatement of premium of such individual policy holder, within such year." In passing upon this, the court said:

"On the other hand, what the company is seeking is not to have 'nonincluded' a part of the premiums which were actually received within the year, or which appear, as matter of bookkeeping, to have been received but actually were not. It is seeking to have the aggregate of premiums actually received within the year reduced by an amount which the company paid out within the year; and which it paid out mainly on account of premiums received long before the tax year. What it seeks is not a noninclusion of amounts paid in—but a deduction of amounts paid out."

The only point decided in the Penn Mutual Case was that the company was not entitled to deduct the amount of deferred dividends paid in any taxing year and not applied in abatement or reduction of current premiums. The conclusion reached affirmed the Circuit Court of Appeals in the Third Circuit, and we do not doubt the correctness of the law it laid down and applied to the facts of that particular case.

But the question which was before the court in that case is not the question which is before this court in the instant case. In the case before the Supreme Court the Penn Mutual Company claimed a right to deduct from income the amount of dividends paid to deferred dividend policy holders. This the company could not do under a law which provided that insurance companies shall deduct "the sums other than dividends paid within the year on policy and annuity contracts." But the question in the instant case does not relate to "dividends" paid, but to "overpayments of premiums," which is quite another matter, under a law which declares that the companies "shall not include as income in any year such portion of any actual premium received from any individual policy holder as shall have been * * * credited to such individual policy holder * * * within such year." The two things are absolutely distinct and appear to be recognized to be such by the act itself.

The Commissioner claims, and it is contended in this case, that to entitle the companies to deduct a credit it must be an absolute credit to the individual policy holder, and that a provisional credit to a class of policy holders is not an absolute credit to an individual policy holder, and therefore not a credit contemplated by the taxing acts. Is this contention sound?

The act of Congress declares that these companies shall not include as income in a particular year such portion of an actual premium received from an individual policy holder as has been credited to such individual policy holder within such year. The important thing here is that the individual policy holder must have been credited with some portion of the premium received from him in the particular year. The method by which the plaintiff kept its accounts is stated in the margin.[1]

---

[1] When plaintiff received a premium from a policy holder, he recorded the sum so received from him on a card kept for that purpose containing his name and his policy number, called a premium card. At the end of each year,

The plaintiff insists that what it did was to find out what each deferred dividend policy holder overpaid, just as it found out what each annual dividend policy holder overpaid, and that it credited the sum so overpaid to each individual deferred dividend policy holder at the same time and in precisely the same way as it credited it to each individual annual dividend policy holder, and that it kept the record of the credit in precisely the same way.

The defendant insists that what this

plaintiff did was insufficient, as it was not "credited" to the individual policy holder within the meaning of the act.

The statute declares that life insurance companies are not to "include as income in any year" any portion of the premium received from any individual policy holder as "shall have been paid back or credited to such individual policy holder." We think the phrase "credited" to the "individual" policy holder means finally and irrevocably so credited. The credit in this case was never given

---

including the year 1912, in taking an account of its business for the year, it ascertained from its records the total sum received as premiums for the year and the total sum received for the year from all other sources, and these two sums it added together. It then ascertained the amount of policy claims paid for the year, the amount of its current expenses for the year, the several sums required to increase its reserves and the amount required to increase the sum held for contingencies. These sums it added together and deducted the amount of them from the amount of its total receipts for the year; the difference constituted the overpayments of premiums which policy holders made for the year, which it divided between its annual dividend policy holders as a group and its deferred dividend policy holders as a group in proper proportion. In this way it ascertained the fact that during the calendar year, 1912, the overpayments of premiums made by all the plaintiff's policy holders aggregated the sum of $13,900,061, of which aggregate $5,710,143 were the total overpayments made by annual dividend policy holders and $8,189,918 the total overpayments made by deferred dividend policy holders.

Said overpayments of premiums made by its annual dividend policy holders it distributed among those policy holders by a mathematical calculation based on the amount of annual dividend insurance in force, the year of issue of the several policies, the plan of the policy—that is, whether it was ordinary life, limited payment life, joint life, endowment, or other form of policy—and the age at issue. By this calculation it ascertained the amount of overpayment made by each insured on each $1,000 of insurance for each year of issue on each policy plan and at each age of issue. The overpayment so ascertained, when multiplied by the number of thousands of dollars of annual dividend insurance in each year of issue, on each plan and at each page of issue, equaled precisely $5,710,143 when the products of such multiplication were all added together. This rate of overpayment for each $1,000 of insurance it recorded on a form in use for that purpose and bound the forms together; and it further multiplied the overpayment rate for each $1,000 of insurance by the amount of insurance paid for in 1912 under each policy of the year of issue, the insurance plan and the age at issue to which the overpayment rate applied, as shown by said dividend rate volume, and about 60 days before the anniversary of the insurance it entered the product on a card as the amount of the dividend on each such policy to be accounted for to the policy holder

on the next anniversary of the policy. This card on which the total amount of the dividend was thus entered was not the same record as the premium card on which the plaintiff credited premiums when they were received, but was a different card, kept in a different division, and contained only the number of the policy, the year, month, and day the insurance began, plan of insurance, amount of insurance, and the age of the insured at issue, and was used solely for sending out to the annual dividend policy holder notice of the amount of said dividends payable on the anniversary of the policy, and for accounting for the same.

By a like mathematical calculation, it ascertained the amount of overpayment made by each deferred dividend insured on each $1,000 of insurance for each year of issue on each insurance plan and at each age at issue. The overpayment so ascertained, when multiplied by the number of thousands of dollars of deferred dividend insurance in each year of issue on each year of issue on each insurance plan and at each age at issue, equaled precisely the sum of $8,189,918 when the sums so multiplied were all added together. This rate of overpayment for each $1,000 of insurance it recorded on a form in use for that purpose, and bound these forms together, each year of issue making a separate volume. But it did not, as in the case of annual dividend policies, multiply the overpayment rate so ascertained and recorded for each $1,000 of insurance by the amount of insurance in force under each policy, and record the product on a card, but it merged said total overpayments made on deferred dividend policies, namely, said sum of $8,189,918, into an account called in its annual report to the insurance department, "amount set apart, apportioned, provisionally ascertained, calculated, declared or held awaiting apportionment upon deferred dividend policies," which account recorded the accumulated overpayments of all deferred dividend policies except those on which a dividend was payable during the accountancy year, in the present case during the calendar year 1913; and after it had added to said account said sum overpaid in 1912 by the plaintiff's deferred dividend policy holders, the amount thereof was the sum of $85,142,216.

The plaintiff did not keep a ledger account with any policy holder. It kept its accounts by the card system—the card kept in one department of its organization showing one aspect of the policy, and the card in another department showing another. When the policy holder paid each premium, the plaintiff immediately credited him individually on his premium card with the premium he paid.

to the individual policy holders as respects the controverted sum of $8,189,918. What really happened was that the credit was given to a class to which the individual holder belonged. The funds so credited to the class were carried by the company, not as a part of its general funds, but as a special fund, and this special fund, with its accumulation from year to year, was carried for the sole benefit of the class; there being no participation in the accumulated fund until maturity or until the distribution period arrived, and then only such of the policy holders as are then surviving are entitled to the fund— the whole of which is distributed between them. The deferred dividend policies contain the following provisions:

"That no dividend of surplus shall be allowed or paid upon this policy, unless the insured shall survive until completion of its distribution period, and unless this policy shall then be in force.

"That surplus or profits derived from such policies on the distribution policy plan as shall not be in force at the date of the completion of their respective distribution periods, shall be apportioned among such policies as shall complete the distribution periods."

Can it properly be said that crediting the class is the same thing as crediting each individual policy holder who constitutes the class, notwithstanding the fact that his right ultimately to share in the fund is not absolute but contingent wholly upon his being alive when the period of distribution is reached? We do not think that it is such a crediting of the individual policy holder as is required by the act. And in the Penn Mutual Case the Supreme Court said:

"The noninclusion clause * * * excludes from gross income those premium receipts which were actually or in effect paid by applying dividends."

It further said:

"The reason for the particular provision made by Congress seems to be clear: Dividends may be made, and by many of the companies have been made largely, by way of abating or reducing the amount of the renewal premium. Where the dividend is so made, the actual premium receipt of the year is obviously only the reduced amount. But, as a matter of bookkeeping, the premium is entered at the full rate and the abatement (that is, the amount by which it was reduced) is entered as a credit. The financial result, both to the company and to the policy holders is, however, exactly the same whether the renewal premium is reduced by a dividend or whether the renewal premium remains unchanged but is paid in part either by a credit or by cash received as a dividend, and the entries in bookkeeping would be substantially the same. Because the several ways of paying a dividend are, as between the company and the policy holder, financial equivalents, Congress doubtless concluded to make the incidents the same also as respects income taxation. Where the dividend was used to abate or reduce the full or gross premium, the direction to eliminate from the apparent premium receipts is aptly expressed by the phrase 'shall not include,' used in clause (c) above. Where the premium was left unchanged, but was paid in part by a credit or cash derived from the dividend, the instruction would be more properly expressed by a direction to deduct those credits. Congress doubtless used the words 'shall not include' as applied also to these credits, because it eliminated them from the aggregate of taxable premiums as being the equivalent of abatement of premiums."

And it added:

"* * * Congress has acted with entire consistency in laying down the rule by which, in computing gross earnings, certain amounts only are excluded; but the company has failed to recognize what the principle is which Congress has consistently applied. The principle applied is that of basing the taxation on receipts of net premiums, instead of on gross premiums. The amount equal to the aggregate of certain dividends is excluded, although they are dividends, because by reason of their application the net premium receipts of the tax are to that extent less."

It seems to us clear that a dividend to constitute a credit in the tax year which may be deducted from or noninclude in the premium paid by an individual policy holder in said year must be such a credit to such individual policy holder as effects a reduction in the amount of premium received by the company from such individual policy holder, and must be the equivalent of a cash payment to, or an abatement of, premium of such individual policy holder. As the overpayments here involved were not, and could not be, credited in 1913 to the individual policy holders who made them, the noninclusion clause manifestly did not sanction their deduction.

The plaintiff attempts to distinguish the Penn Mutual Case from the one now before this court, in that the dividends were held

not to be deductible in the former case "because such dividends were dividends" as distinguished from overpayments, "and because another clause of the law expressly said that insurance companies should not deduct dividends." The fact is, however, that the dividends were held to be not deductible, not because they were dividends, but because they had not been applied to abate or reduce the current premiums of the respective policy holders who had made them.

[2] It appears that plaintiff owns a large amount of securities which it purchased at a premium. It amortized its securities, and as a result entered upon its books during the year 1913 as a loss sustained during the year several sums which aggregated $332,466.72.

This amount so claimed as a loss represented the yearly proportion of the difference between par which the plaintiff would eventually receive upon securities owned by it if it held such securities until maturity and the purchase price above par. The commissioner refused to allow any part of this sum as a deduction, and assessed and collected on account thereof accordingly $3,324.67, which forms a part of the additional tax imposed, and which the plaintiff paid, and which it is now seeking to recover in this action. The court below, in passing on this phase of the case, held that the Commissioner of Internal Revenue was in error in refusing to allow any part of this sum as a deduction.

This court, in New York Life Insurance Co. v. Anderson (C. C. A.) 263 F. 527, had a somewhat similar question before it. In that case, however, the question arose under the Corporation Tax Act of August 5, 1909 (36 Stat. 112). That act, in section 38, provided that the net income should be ascertained "by deducting from the gross amount of the income of such * * * insurance company, received within the year from all sources * * * (second) all losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation of property, if any. * * *" The court below had held that under this provision the company, in ascertaining its losses sustained within the year, could not include the depreciation of securities taken at market value if the securities had not actually been sold. In his opinion that court said:

"A merchant, on the other hand, does not ordinarily include the variations in the market values of his stock in counting his profits. They may shortly be restored to their value, and the time to charge his profit with them is when they are sold, and the gain or loss finally ascertained." (D. C.) 262 F. 215, 217.

This court reversed the case, and said:

"It is here admitted that, judged by any standard familiar to business men, the securities of plaintiff were worth at the end of 1910 several million dollars less than they were at the beginning of that year. It is further admitted that, not only was it the business custom of plaintiff to revalue its securities in accordance with the market annually, but that such procedure was and is a reasonable business conservatism, and a frequent, though not universal, statutory requirement.

"Under this taxing act the question is not strictly whether depreciation in market value is a loss, but whether, when Congress specifically includes within 'losses actually sustained within the year, * * * a reasonable allowance for depreciation of property,' depreciation does not become a loss, no matter what persons other than Congress may think on the subject.

"We have no doubt that this loss in market value is depreciation. The word means, by derivation and common usage, a 'fall in value; reduction of worth'; and it seems to us to require mention only to prove that the average citizen, for whom statutes are assumed to be made, would judge depreciation of his own bonds by the opinion of the public, however thoroughly convinced of the ultimate wisdom of holding on to what had depreciated."

The ruling by the District Judge in the instant case, holding that the Commissioner of Internal Revenue erroneously treated the amounts amortized as income, has applied to the facts of this case the doctrine laid down in the Anderson Case. But the language of the act of 1913, which is the statute herein involved, differs somewhat from that which governed the Anderson Case. It provides that net income is to "be ascertained by deducting * * * (second) all losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation by use, wear and tear of property, if any." The act of 1913 thus restricts the "reasonable allowance for depreciation" to depreciation "by use, wear and tear." We do not think the depreciation of securities, which had not been sold during the year, comes under the clause relating to "depreciation by use, wear and tear"; neither do we think that it is "a loss actually sustained" during the year. In our opinion the court was in error in its holding upon this subject.

Judgment is reversed, and cause re-

manded, upon the sole ground that the court erred in deciding that the Commissioner of Internal Revenue was not entitled to assess and collect a tax of $3,324.67 on the sum of $332,466.72 which plaintiff claimed it had a right to deduct as a result of the depreciation of its securities during the year.

Judge HAND participated in the conference, after the argument, and concurred in the decision of the case as above announced. He was absent when the opinion was written and filed, but authorized the writer to express his concurrence in the results.

Judge HOUGH dissents.